Again, it's 24-4073, United States versus, I will, I'm sure butcher this, but Aguayo-Montes. And with that, Council Propellant, if you'd make your appearance and proceed, please. Good morning. Can you hear me, judges? Yes. Wonderful. This is Benji McMurray here on Mr. Aguayo. I've been a defense attorney for a lot of years, and when I advise my clients about taking a plea agreement, I often tell them that my most important function at that moment is to help them assess the risks of different possibilities. Usually what we're talking about is the risk of a conviction after going to trial. I don't think anybody could reasonably conclude that I would discharge my duty as a criminal defense attorney by telling my client, if you go to trial, you might be convicted. That would be unimaginable. And the suggestion by the government that a defendant or that a defense attorney discharges his constitutional responsibilities under PDEA by just saying that a particular risk exists really misunderstands completely the entire process of what defense attorneys do. Now, in this case, what we see is a defense attorney who violated PDEA in two significant ways. Number one, the defense attorney affirmatively misrepresented the immigration consequences of this conviction. How did he do that? He told them that there may be immigration issues. So if he had stopped there and the government was right on the law, then we wouldn't have a problem. But he didn't stop there and the government's wrong on the law. But in terms of not stopping there, he didn't just say you may be deported. What he actually said was you don't have to worry about this until you get to prison. And that was flat out wrong. I don't think there is any circuit, any standard where that advice would be sustainable. Once Mr. Aguayo had been convicted and found himself in prison, there was no immigration attorney anywhere who could resolve the problem that his conviction made him automatically deportable. So that's the first problem is that we have an affirmative misstatement of the law, which even the concurrence of PDEA would countenance as a Sixth Amendment error. So let me clarify that you're basically suggesting that we don't even need PDEA. We don't need to analyze whether PDEA, what the perfect language is, whether it's with certainty he's going to be deported or whether it's subject to deportation because this was affirmative misadvice that even pre-PDEA would have been actionable. Yes, I agree with that, Your Honor, that in fact, the affirmative misstatement here would have been reversible or would have been deemed a violation even before PDEA. I don't think there was any question before PDEA. In fact, the Solicitor General conceded the point, the concurrence agreed with the point that affirmative misadvice was constitutionally problematic. Now, with respect, yes, Your Honor. Let me understand one point, though, Mr. McMurray. Let's assume you end up prevailing. Isn't it important for the prejudice aspect that we know the scope of the deficient performance? In other words, there's one thing the affirmative misstatement as it relates to, you don't have to worry about this, but I mean, if the statement that you might be deported is in itself another affirmative misstatement, then it's important for us to make a determination as to whether it is or it isn't, right? I'm not sure I understand the question. All right, then let me rephrase it. Assuming the wonderful world of which you win, okay, and if you win, and then the question we're talking about is how was he harmed? In other words, would it have been such that he would have been harmed by this advice that he received? We would want to know what is the scope of the misconduct, if you can use that word, deficient performance in order to measure the extent of the harm. Well, Judge, and I apologize if I'm missing your point, but it seems to me that your question may be conflating a little bit the first prong and the second prong. I think- I'm trying to do exactly the opposite. Judge Moritz talked about the notion of do we have to get into the nuance of what Padilla commands? What is the nature of the counseling that needs to be provided? And what I'm trying to suggest is perhaps we have to do it a little bit because we have to know what is it that was violated? What ran counter to Padilla here, if anything? So let me speak to that. And I do think it's an important question. And in fact, I think this is really the second big piece of this because in addition to identifying an affirmative misstatement, I do think that counsel fell short of his affirmative obligations under Padilla. And so let's talk for a minute. The government says that effective counsel can discharge his by simply saying, advising the defendant, you may be deported. All right? And the government, I think, in making this argument really cherry picks one phrase of Padilla where they state the holding at the end of the case. And the government construes this statement of the holding in a binary fashion. You have to advise them whether a risk exists, yes or no, on or off, black and white. And so that's the government's argument. And I think when you read Padilla in its context, that myopic focus on that last claim really is unsustainable. So let me just point you a couple parts in Padilla that I think are really useful. First of all, you've got at the very beginning of the decision, you have language, let's see, that talks about that the counsel has the duty to advise about an automatic deportation. On page 1478 of the Supreme Court reporter, constitutionally competent counsel would have advised defendant that his conviction for drug distribution made him subject to automatic deportation. This is the risk that Padilla is talking about, not just the mere possibility of removal. I suspect probably every non-citizen defendant walks into court that very first day knowing there's a risk. They probably don't even need an attorney to tell them there's a risk. Now, in many cases they do, but what they need an attorney who will tell them, who will quantify that risk. Now, so how much does an attorney need to say about that? The Supreme Court has never said that you have to quantify and go into great explanation about the probabilities. You must advise him that he may be deported. Now the rest of it's just generous. Well, again, Your Honor, I think that trends towards this myopic reading of Padilla because the Supreme Court has given us some guidance. The Supreme Court, to be sure, does say there are situations where the consequences are too complex to pin down, but the Supreme Court identifies at least one category of cases where it's not so complex. And so, in fact, this is on page 14. Well, wouldn't you have to show or at least argue that but for the lack of appropriate advice, the plea would not have been taken? And if it wasn't taken, the conviction is open? Yes, Your Honor, but that goes to prong two of Strickland. That goes to prejudice. That's a factual question. There is no finding. That's what Chief Judge was trying to get at. Where is the prejudice? Well, you're talking the judge in this case. I mean, the records. Judge Holmes was trying to get you to answer that question. Well, so, again, I think the prejudice, so there are two parts, right? The constitutionally deficient advice, and we can talk about the ways in which this was constitutionally deficient. We can try and quantify or qualitatively describe what competent advice should look like, and I do have some comments on that still to make. But with respect to prejudice, the prejudice prong is simply had the defense counsel effectively advised the defendant, would the outcome have been different? Would he have taken the plea agreement? And on that second prong, that is a highly factual determination. The district court did not reach that question. And so a remand would be necessary to decide had the defendant known the consequences, would he actually have rejected this plea agreement? And Mr. Murray, let's go back to deficient performance, and I want to tease out something from your colloquy with Judge Kelly. It seemed to me, you know, the language that I looked at and the idea that sticks out to me is where the court said, when the deportation consequence is truly clear, as it was in this case, the duty to correct advice is equally clear. Now, it seems to me that one could posit, and I want to get your reaction to this, one could posit that a counsel is not required to do a probabilistic analysis, and I think that that's what Judge Kelly referred to, but they are required to tell you things that are straightforward and clear, like this makes you deportable, full stop, and you're presumed to be deported under this, because I think that appears in Padilla as well. And so, I mean, it seems to me there are two different things here. Do you accept that the notion that if it's clear that, number one, you're deportable, and number two, it's presumed you'll be deported, that those things are clear on the face of the statute? Yes, yes, I agree with that. I think that's exactly what Padilla says. And let me hit the pause button. All right, go ahead. That's what Padilla says. Would you accept also that you would not necessarily be in a game where you have to give odds of whether you ultimately would be deported? That was Judge Kelly's reference to probabilistic reasoning. It would seem to me that that is not required by Padilla, but I want to hear your response to it. So, I think that when it comes to this probabilistic inquiry, I do think that's a little bit more complicated. My clients ask me all the time, what are the chances I'm going to get convicted? What are the chances I'm going to get a sentence of X, Y, or Z? And I often oblige them by giving them a number. 60% chance you get a 10-year sentence. 20% chance you win a trial. All right, I can't imagine a scenario where a defense attorney who obliged the defendant by giving odds was deemed to be ineffective because he obliged them in that way. I mean, this is- But what I'm saying is, would that defense counsel be required to give the grace that you did in that situation? No, I don't think so. No, I don't think so. Padilla wouldn't require that, right? And I don't think Padilla requires that kind of specificity with respect to the odds, but what Padilla does require is that what's knowable, you have to tell them. All right. And in other cases, in a different case, we could argue about what's knowable, but this case is indistinguishable from Padilla. Going back again to 1478, constitutionally competent counsel would have advised the defendant that his conviction for drug distribution made him subject to automatic deportation. That's the affirmative duty that Padilla articulates. This, like Padilla, was a drug distribution conviction. There is no meaningful distinction. This case is controlled by Padilla. I'd like to reserve my time. Let me- All right, go ahead. Go ahead. I think Judge Moritz had something. Just a quick question. I wanted to- That language would be about being subject to automatic deportation. Your brief uses different language. Sometimes the Ninth Circuit's language about certainty, and they're all very close, but would you say that had that been the language used here, subject to automatic deportation or presumptive deportation, that it wouldn't have required the word certainty, which to me seems to get more probabilistic? I do agree with that, Judge. I will hold that out as a deficiency in my briefing. There are a lot of ways that people have gotten at this, and the Ninth Circuit has gotten it at one way. I will note that the Eighth Circuit in Ramirez-Jimenez, where the government focuses on, that's not an ag felony case. That's a crime involving moral turpitude. That's tremendously complex. Ag felony, not complex. And let me tease out from Judge Moritz's point. It seems that Padilla regrettably has different uses of language in this, but it seems to me that wouldn't the word presumptively deportable matter more? Because he could have some discretionary relief. We don't know, right? What we know is that the statute makes him deportable, and it can be presumed that he is right? Let's see. I don't remember if Padilla uses the word- It uses. I'll find it. It uses the word. Yeah. Okay. Go ahead, please. Well, I guess here's the thing. I think that there are a lot- It says deportation was presumptively mandatory. Yes. Thank you. I would feel very comfortable using those words. I think the language of Padilla requires reversal in this case. Let me just say very quickly, if I could, as a concluding thought, I believe that the standard of Ramirez-Gimenez is supportable by Padilla. And I believe that Judge Holmes, that you could be right, and probably are right, that if it's clear that defenses to removal exist, that competent counsel should at least acknowledge those. As in this case, it takes- Oh, no. I wasn't positing that. No, no. Okay. All I was saying is presumptively mandatory, which means that you may be able to get out of it. That's not my business to know how you could get out of it. No, I wasn't going there. I think that construing Padilla in that way would not be incorrect. Let me ask you a housekeeping question. And opposing counsel, I'll give you sufficient time. Let me ask you a housekeeping question. There is some language about Mr. Kramer. The idea was that Mr. Kramer provided, he met with Aguayo to discuss the plea agreement. And did he do more than just read what the plea agreement said about what the condition would be for his possible deportation? In other words, the language in the plea agreement, did he give a separate advisement apart from that? That would be a great question at an evidentiary hearing. The information that I know is largely described in the petition. And of course, in the petition, it's in a summary fashion of a conversation. But Mr. Aguayo says, I told him I didn't want to be deported. That was my biggest concern. But the petition speaks as if what he did is he came in and said, I want you to know, this is what we are agreeing to and read the language about, you may be deported. Yes. My understanding is that there was zero explanation of what that meant and that such was not needed because that could be taken up with an immigration attorney once he was in prison. Understand. Okay. Thank you, counsel. We'll hear from the government now. Good morning, your honors. Riggs Matheson for the United States. Your honors, I'd like to start with the question that you posed to my friend about whether there is any prejudice shown in this case, because I do think that that is, as Strickland posited, the more straightforward basis to affirm the district court's denial of Mr. Aguayo's 2255 petition. And that analysis begins from the strong presumption that what Mr. Aguayo told the district court below under oath in writing and orally was true. And that's that he wanted to plead guilty because he was guilty and that he wanted to plead guilty knowing that that could lead to his ultimate removal from the United States. And as this court explained in Heard versus Addison, in Dominguez, most recently in United States versus Kern, the inquiry at that focuses on the objective evidence, the factual circumstances surrounding the plea. And it asked whether it would have been objectively rational for Mr. Aguayo to have rejected what was ultimately a very favorable plea agreement. The plea agreement contained a stipulated sentence that was about half of the low end of Mr. Aguayo. You're going into prejudice now. We should focus first on the performance issue. And I don't, I guess I don't understand why the fact that he told the court that he understood the plea when it said, and the plea used this exact language, you may be at risk for deportation. And he says, he says, I asked my counsel, what does that mean? That's very important to me. What does that mean? And my counsel said, I don't really know. I'm not an immigration lawyer, but hey, don't worry about that until you're in prison. And then you can talk to an immigration lawyer. That's what his counsel explained that that line in that he was going to be agreeing to meant. And so he said, okay, that's his testimony. I guess I said, okay, well, I can agree to that. That's what I'm going to do. He was given potentially affirmative misadvice by his, if this was affirmative misadvice by his counsel, that led him to say to the court, okay, yes, I understand what risk of deportation means. So aren't we really I mean, isn't that really kind of fact question that and, and as opposed to anything that we can talk about yet, what the court might have, what impact his agreements to the court meant. You see what I'm saying? We're looking at what counsel told him and whether that might've confused him. I think I understand the court's question. Let me take it in two parts. The last part of your honor's question, whether, what can we take from his statement at the plea hearing? What can we take from his signature? That was your focus. That's your focus. But my focus is what did his attorney tell him about that very line? Understood your honor. Just briefly, the point that I was making is just the departure point for the prejudice analysis is the presumption that what Mr. Aguayo previously told the court was true. Now it goes on from there, and I'm sure we'll get into that, but to address the other part of your question, counsel's, the scope of counsel's duty under Strickland, under Padilla. I want to address first my friend's suggestion that what Padilla really requires is more than advising the client, whether his guilty plea carries a risk of deportation. And that's the And I agree with my friend that the context for that holding in Padilla is important. I just happen to think it points away from the type of rule that he is proposing this court should adopt. And I would point the court in particular to the second circuit, the en banc second circuit's opinion last year in the Farhane case that's cited in the government's brief. And in that case, the second circuit cataloged the majority opinion in Padilla and it noted that on five or six different occasions throughout the opinion, Padilla emphasized that it was talking about the risk of deportation. It wasn't speaking in terms of ultimate removal from the United States. It talks about eligibility for deportation, the possibility of deportation. That was the risk that Padilla was concerned needed to be conveyed to the client in that case. And Chief Judge Holmes, I do want to address the specific language that you cited from Padilla about the clear consequence and the need for the advice to be equally clear. That comes at page 369 of Padilla and it follows the court's articulation of what the succinct, clear and explicit consequence of Mr. Padilla's conviction was. And notably, the majority does not say that the clear consequence of Mr. Padilla's conviction is that he ultimately will be deported. And it doesn't say that his counsel erred because she failed to inform him that he would be deported. Well, the clear consequence was definitely more than you have a risk of deportation. He was presumptively mandatorily deportable. And if you look at the statute, there's no risk. I mean, that's the way it is, right? Well, two responses to that, Your Honor. The statute uses the word deportable. The majority in Padilla at page 368, again, is talking about what the succinct, clear and explicit consequence of his guilty plea was. They describe it as his eligibility for deportation. He didn't tell, well, this lawyer told him you had a risk of deportation. He didn't even tell him you were deportable. Because if he had told him that, what that would have told him is his DACA status was done. And then the question was whether he was actually going to leave the country. He didn't even tell him that. He just said you have a risk of deportation. To be clear, Your Honor, I think what the record shows, and at this point, all we have are the allegations in the 2255 motion. What Mr. Aguayo alleges is that he and his counsel read paragraph 2B of the plea agreement, which says in no uncertain terms, if you are not a United States citizen, you may be removed from the United States. That I think is fairly straightforward, as straightforward as the word deportable in the permissive. That doesn't say deportable means you enter into a different status. If you're in a DACA status, you're not deportable. If he had just said that, even though I don't think that Padilla necessarily meant that enough, but if he had said that, that would at least put him in a different situation. And what I note, Mr. Matheson, is if you look at what Judge Alito says when he joins, he even says that what was required is what this law requires in a succinct and straightforward fashion. What does this statute require in a succinct and clear fashion? It says you're deportable, right? It does, Your Honor, but I read Justice Alito's concurrence to be responding to what he described as a, quote, vague halfway holding in the majority opinion that is susceptible to these types of interpretations that the Ninth Circuit and the Fourth Circuit have adopted, but the Eighth Circuit has rejected and that the Second Circuit in Farhain, at the very least, appears to be resistant towards that kind of a safe harbor words type of requirement. Again- So he's complaining about it. He's complaining about it, but he's acknowledging that's what they're holding. He doesn't like it, but that's what he says they're holding, right? I think he is expressing his concern with the way the holding could be misinterpreted. Again, describing it as vague and a half measure, a halfway type of holding, but what Padilla actually says, the majority does not go so far. It says, we now hold that counsel must inform her client whether his guilty plea carries a risk of deportation, and that was the Strickland prong one error in Padilla, and again, as my friend points out, we don't have to speculate about how the Padilla majority would have addressed Mr. Aguayo's conviction. It's the same class of aggravated felony, and Padilla does not say that Mr. Padilla's counsel failed to meet the standard under Strickland and was objectively unreasonable because she failed to inform her client that it was virtually certain he was going to be deported, or to use the word- I don't even want to use the virtually certain word. Let me ask two questions. Do you accept the premise that the clear, unambiguous language of, what is it, 1227 would be that if you get a controlled substances conviction, you are subject to deportation, not made, not risk, you're subject to deportation? Respectfully, your honor, I would say that the statute uses the word deportable, and insofar as- Well, all right, let's go with the word deportable. Do you accept the premise the statute says you're deportable if you have that conviction? Yes, you are subject to- Okay, well, is there a distinction between risk of deportation and you're deportable? I think that under Padilla, the concern under the Sixth Amendment is that risk sufficiently conveys to the client the possibility of removal from this country. But if Padilla calls for you to- That passage that I alluded to before basically was designed to say, to respond, I think, to the dissent and saying, look, we're not requiring you to do anything complicated here. Immigration law is complicated. But if something on its face says A, and counsel can easily see A, then counsel has to tell their client A. And if, as I understand you to accept the premise that this statute says, if you get convicted of a controlled substance offense, you're deportable, why would the obligation under Padilla not to be to say, not that you have a risk of deportation, not that you may be deported, but you're deportable? Why would that obligation not exist? Two responses to that, Your Honor. The first is that if Padilla wanted to impose a requirement, the counsel must parrot the language of the statute and use the word deportable. That is the only way to satisfy the Sixth Amendment and to discharge his or her duty under the Strickland Prong one. Padilla would have said that. Instead, when it says what it held, we now hold that counsel must inform her client whether his guilty plea carries a risk of deportation. They wouldn't have said that. The second point, Your Honor, is that it makes sense that Padilla would draw the line where it did. Ultimately, Padilla is an application of Strickland's jurisprudence. The question is not whether counsel used specific language from the statute. It's not whether counsel gave perfect advice or even best practices. The touchstone is always whether counsel's advice was objectively unreasonable. I think under the circumstances presented here, where counsel reviewed the plain language of paragraph 2B of the plea agreement, which states, if you are not a United States citizen, you may be removed from the United States, the risk, whether the guilty plea carried a risk of deportation, that information was conveyed to the client. No, no, no. So you don't... No, go ahead. It was not conveyed. That was according to Mr. Guayamontes. He said, what does that mean? What does that sentence mean that is in my plea agreement? And his, what is in the record is that his counsel told him, I don't know. I don't know. I'm not an immigration attorney. You'll have to wait until you get to prison and then you can get your immigration attorney. That is not saying, oh, that just means what it says. You're at risk for deportation. It isn't even that much. It's misadvice. And what is that competent counsel to say? I don't really know what that means. You'll have to wait. That is misadvice and misleading. And I just don't know where the record confirms what you're saying, that counsel said, it means what it says, essentially. You did something worse than that. Your Honor, I agree that if all that had happened below is Mr. Aguayo had gone to his attorney and said, what are the immigration consequences of my conviction here? And counsel had said, I don't know. Don't worry about it. That would be a stronger case that counsel failed to convey the information that Padilla requires, which is whether his guilty plea carries a risk of deportation. Now, I understand the court's point. I do want to emphasize with my limited time, however, that even if counsel's advice fell below Strickland Prong One, Mr. Aguayo cannot satisfy prejudice in this case. As this court has said time and again, Chief Judge Holmes, as you explained in Dominguez, Judge Morris, as you explained in the Rippey case, both are cited in the government's brief. The focus remains on the factual circumstances surrounding the plea and asks whether there's anything in the record that substantiates the appellant's or the 2255 move-ins after the fact allegations about what he would have done, what he cared about, and why he would have insisted on going to trial. You're absolutely right. And I'm sorry to cut you off, but you're absolutely right. But why did we do that here? I mean, if there is deficient in performance, the district court did not reach the prejudice prong. And so why would that be an undertaking we would even attempt here? Because the record is sufficient to make that determination. And as this court has done time and again, it can decide the prejudice prong without addressing performance. And even if there's no evidentiary hearing below, and I would cite the Gilchrist case, Saucedo-Avalos, and the Headley case that are all cited in the government's brief. More to the point, Your Honor. The record, in terms of what can substantiate the defendant's after the fact allegations, is not going to change as a result of remanding or any sort of- Why wouldn't it? Didn't they file? Did anybody get the Kramer file, Mr. Kramer's file? It was not available, Your Honor. And it's not available. Well, why couldn't it be available below? Your Honor, I can represent to the court that we're unaware if it exists. Setting that aside, however, the more important point, I think, is that the inquiry is largely objective. It looks at the objective evidence, and that is what is not going to change. The question, the type of evidence that is lacking in Mr. Reguia's case, I think, is best shown by comparing it to the types of cases where that evidence was present. Let me direct the case, excuse me, let me direct the court first to the Rodriguez-Vega case, the Ninth Circuit case that my friend relies on under Strickland Prong 1. In that case, the court noted that the defendant had previously rejected a plea offer that contained a stipulated removal proceeding, or excuse me, provision, a stipulated removal provision. That was evidence, the court noted, that substantiated what Rodriguez-Vega was saying after the fact about what he cared about. There's nothing like that here. Or, for example, in Lee versus United States, as we pointed out in the brief, there the plea colloquy reinforced or supported what Mr. Lee was saying after the fact. And as this court pointed out in United States versus Reed, the most important evidence in making this prejudice inquiry is the strength of the government's case. And in this case, Mr. Aguilar doesn't allege that he was innocent, doesn't identify any plausible or viable defense to his charges, and doesn't even allege there was any infirmity or weakness in the government's proof against him. And so what is worrisome about this, Mr. Matheson, is that the district court didn't tease any of this out. I mean, what we'd be doing is being called upon to do this on appeal, and we would be betting that there wouldn't be anything else found below. I agree with you that it's an objective standard. I mean, well, the law is the law. It is an objective standard. But how are we situated to be able to know? I mean, I don't know what could be found below in a hearing. Let me give the court two responses. I see I'm out of time. The first is that this court has addressed prejudice under these circumstances before in the Gomez-Lugo case that's cited in the government's brief. That was actually a direct appeal of an ineffective assistance claim based on a PDA violation. This court determined that the record was sufficient to deny the claim on prejudice grounds. Secondly, and I think more importantly, again, the two most important sources of evidence that this court looks to, contemporaneous with the plea. What happened at the plea colloquy, that's what Lee versus United States teaches, and the strength of the government's case. That's what Dominguez and Rippey and Heard versus Addison require. Those two sources of evidence are not going to change on a remand for an evidentiary hearing, because we know what happened at the plea colloquy, and we know that Mr. Aguayo does not even allege any weakness in the government's case. Let me interrupt you, because what happened at the plea colloquy here is very instrumental in terms of what happens. He agrees to this plea agreement where he had been misinformed about what the meaning of it was. I don't know that any court looking at this now could necessarily rely on that plea agreement. I guess what you're not taking into account here is what the court said in Lee. I don't think that was restricted to the facts of Lee, which is there are many cases like this where a defendant facing deportation would much rather reject any plea agreement, any plea agreement, in favor of a hail mark because they want to stay here. This was a DACA decision. Ben Harrison was a young child, and we don't know what the district court might do with these facts, but I don't understand why we wouldn't give it back to the district court. Because, Your Honor, I think that that gets the analysis that Lee requires backwards, which is the question is, what does the plea colloquy show to substantiate the allegations? And in Lee, when the district judge asked Mr. Lee, how did the immigration consequences of your conviction, or how does that affect your decision to plead guilty today? Mr. Lee said, I don't understand. And it was only after his counsel came over and assured him this is just a boilerplate type of warning, that he was willing to plead guilty. And so the court said, that is the type of evidence that supports the after the fact assertions and leaves room for doubting his plea and his testimony under oath that he wanted to plead guilty notwithstanding or with an understanding of the immigration consequences. And here, looking at the plea colloquy, there's an absence of substantiation. There's nothing in there like the exchange in Lee or like the objective evidence in Rodriguez-Vega or even in the Fourth Circuit case in Suave, where the defendant at least alleged, I would have contested the estimated loss amount for my counterfeiting conviction if I had different advice of counsel about the immigration consequences. And the court said, that's the type of argument that at least needs to be made. And it would be objectively rational for a defendant to challenge that type of conviction on that particular element. Mr. McGuire does not even allege that. And so I don't think that there's any reason to remand for something that he's not even asserting. Thank you, counsel. Mr. McGuire, I was going to end this, but since Mr. Matheson, we did it, my fault. But since he's gone over, why don't we go for a minute and a half if you want it. You don't need to take it, if you want to take it. Well, certainly, if the court has any questions, just maybe because you've asked about it a lot, Judge Holmes, one of the ironies that I see in the government's argument today is that it seems to be the government that is actually pushing us towards a quantitative risk assessment. Because what the government, I think, has essentially conceded the rule of Padilla, the conviction here rendered him deportable. And they want to say, well, it doesn't really matter because there were these defenses that could have been available. So we can't really say that it was automatic. I don't think the court needs to go there. I think the court could, the Ninth Circuit did. I expect more of defense attorneys, but I think under Padilla, it's clear that... I think this case is indistinguishable from Padilla. This is a drug trafficking conviction, just like Padilla. And Padilla tells us the duty of counsel when there's a drug trafficking conviction. You have to tell them that deportation is automatic. I think that, again, looking at the Eighth Circuit case, I think the court can meaningfully distinguish between aggravated felony cases and crimes involving moral turpitude. I'm not in a It takes some work, but that is exactly what the lawyers are expected to do. On prejudice, I think you've got the point. There are no factual findings here. What is the story on the Kramer file? What's your view on that? Is it obtainable? So yes, we have it. We just haven't had the chance to get to discovery. And so we're happy to produce it if we get to that point, but I've got it. He was alive when we filed this, but there are many issues. There's credibility determinations. There are factual determinations. There may be more to come out about what Kramer actually said or didn't do. His files may have something, so it's not a done deal. What Lee importantly tells us that this court can't do is defined as a matter of law, which is what the government essentially wants you to do. You can't find as a matter of law that the petitioner's assertion that he would not have gone to trial had he known, had he been correctly advised. You can't find as a matter of law that that's an irrational position and therefore unacceptable. We have to have an evidentiary hearing on the second prong. All right. Case is submitted. Thank you for your time. Thank you.